IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **JACKSON PAVELKA AND KAYLEE PAVELKA**, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>**PAUL MOSS INSURANCE AGENCY, LLC D/B/A EPIQ INSURANCE AGENCY**, an Ohio limited liability company,<br><br>*Defendant.* | Case No.: 1:22-cv-2226<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR DETERMINATION THAT PLAINTIFFS ARE NOT PROPER PARTIES AND TO DISMISS THE COMPLAINT** |

**I.     INTRODUCTION**

Defendant Paul Moss Insurance Agency, LLC d/b/a Epiq Insurance Agency ("Epiq" or "Defendant") serially violates the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. ("TCPA" or "Act"). Indeed, Plaintiffs Jackson Pavelka and Kaylee Pavelka ("Plaintiffs") received multiple telemarketing calls and text messages from Epiq despite never providing any prior express consent to receive the offending calls and texts. Thus, Plaintiffs, on behalf of themselves and classes of similarly-situated individuals, filed suit to put an end to Epiq's unlawful conduct.

In search of a quick exit, Epiq filed a motion for determination that Plaintiffs are not proper parties and to dismiss the complaint. While the motion fails to articulate any basis or standard for the Court to apply, it purports to seek "dismissal" of the claims, by arguing that: (1) Plaintiffs have not alleged sufficient facts to plausibly allege that the calls and texts were autodialed; (2) Plaintiffs have not sufficiently alleged that they received a call featuring a

1

prerecorded voice; (3) Plaintiff lack standing to bring the claims at issue; and (4) Epiq cannot be held vicariously liable for some of the calls at issue. Of course, a motion to dismiss is untimely and improper under Rule 12(b). But in any case, the arguments fail. Epiq simply misunderstands the TCPA.

First, Plaintiffs have alleged sufficient facts to support a reasonable inference that an automatic telephone dialing system ("ATDS" or "autodialer") was used to place the calls and texts. Second, by alleging the content of the prerecorded message, Plaintiff likewise sufficiently alleged the use of a prerecorded voice. Third, Plaintiffs alleged the harms associated with invasions of privacy sufficient to confer standing. And fourth, Plaintiffs allege that Epiq directly placed the calls and texts at issue and can be held directly liable for the violations. To the extent that Epiq hired a third-party to place some of the calls, it can be held vicariously liable for the actions of its agents.

For these reasons and as set forth below, Plaintiffs request that the Court deny Defendant's Motion in its entirety.

## II. STATEMENT OF FACTS

Defendant Epiq is a nationwide insurance agency that primarily sells auto and home insurance policies. (Compl. ¶ 6.) In an effort to sell its insurance policies, Epiq engaged in a wide scale telemarketing campaign, which featured the use of autodialed and prerecorded telemarketing calls. (*Id.* ¶ 7.) In September 2022, Plaintiffs began receiving unlawful telemarketing calls from Epiq.

Indeed, on September 29, 2022, Mrs. Pavelka received an unsolicited autodialed and prerecorded telemarketing call from Epiq. (*Id.* ¶ 20.) Upon answering the call, Mrs. Pavelka

2

heard a "bloop" sound prior to being connected with Natalie, a representative of Epiq, who stated that she would run an auto insurance quote for Plaintiffs. (*Id.*). Thereafter, Mrs. Pavelka heard another "bloop" sound and was transferred to another representative of Epiq named Raven, who verified Plaintiffs' address and sought additional information. (*Id.*) After Mrs. Pavelka heard another "bloop", she alleges that she heard a recording stating that she would be connected to an agent for coverage options. (*Id.*) Mrs. Pavelka then heard yet another "bloop" and another recording stating that they were waiting to connect her with an agent. (*Id.*) Eventually, someone picked up the phone line and informed Mrs. Pavelka that all agents were busy, and she would get a text with quote details. (*Id.*) At that point, she heard a swoosh noise and the call ended. (*Id.*)

Later on September 29, 2022, Mrs. Pavelka received a follow-up text message from Epiq regarding her insurance quote. (*Id.* ¶ 21.) After an exchange of text messages, Mrs. Pavelka requested that Epiq stop placing calls or text messages to her cellular telephone. (*Id.*) Notwithstanding her request, she received another text message on October 6, 2022 from Epiq, which again solicited her to purchase an auto insurance policy. (*Id.* ¶ 22.) Once again, Mrs. Pavelka requested that the calls and texts "Stop." (*Id.* ¶¶ 23-24.) Plaintiffs never provided any prior express consent to received telemarketing calls, and have no relationship with Epiq. (*Id.* ¶ 26.) As such, Plaintiff Kaylee Pavelka, as the primary and customary user the cellular telephone, and Jackson Pavelka, as the subscriber for the telephone, filed the instant lawsuit to put an end the Epiq's conduct. (*Id.* ¶¶ 18-19.)

***Epiq Lodges Additional Incomplete Allegations with its Motion***

In its Motion, Epiq introduces additional factual allegations regarding the calls and texts at issue. That is, Epiq produced two incomplete recordings of the initial call. (*See* Dkts. 20-2; 20-

3

3.) The first recording was apparently provided by Datalot, Epiq's third-party marketing agent, which represents a portion of the initial call. (*See* Dkt. 20-2, Ex. B.) Indeed, the recording starts with, "Hi, this is Raven with Solid Quote and it looks like you're connected to me to compare rates on auto insurance". (*See id.*) While obvious from the phrasing of the introduction, this recording represents only a portion of the initial call. That is, Mrs. Pavelka initially spoke with "Natalie", another representative of Epiq, prior to being transferred to "Raven". (*See* Compl. ¶ 20.) Additionally, the second recording was produced by Epiq represents the portion of the initial call after it was apparently transferred to Epiq. (*See* Dkt. 20-3, Ex. B.)

Epiq also produced its contract with Datalot. (Dkt. 20-3, Ex. A.) Epiq attempts to use this contract to claim that its relationship with Datalot is solely that of an independent contractor over which it exercises no control. (Mot. at 2-3.) Unsurprisingly, Epiq opted to again provide a selective portion of the relevant information. Attached hereto as Ex. A is Epiq's "TCPA Addendum" to its contract with Datalot, which reveals substantial control over Datalot's actions and an agreement to work together to attempt compliance with the Act.

Based on these facts and as set forth below, the Court should deny the Motion in its entirety.

**III.    ARGUMENT**

As a preliminary matter, Epiq's Motion fails to set forth a clear basis for the relief it seeks or a standard for the Court to apply. Instead, it confusingly asks the Court for an Order declaring that Plaintiffs are "not proper parties" and then asks that the Complaint be "dismissed". On the one hand, the request to "dismiss" the complaint appears to suggest that the motion is a Rule 12(b)(6) motion. Of course, a Rule 12(b)(6) motion would be untimely and improper. *See* Fed. R.

4

Civ. P. 12(b) ("A motion asserting any of these defenses <u>must be made before pleading</u> if a responsive pleading is allowed." (emphasis added)). In addition to its untimeliness, Epiq's extensive reliance on matters **extraneous** to the pleadings renders its Rule 12(b)(6) motion further improper. *See Bridal Expressions LLC v. Owners Ins. Co.*, 528 F. Supp. 3d 775, 779 (N.D. Ohio 2021), aff'd, No. 21-3381, 2021 WL 5575753 (6th Cir. Nov. 30, 2021) ("when ruling on a Rule 12(b)(6) motion, the court is limited to the allegations of the complaint." (citing *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997))).

On the other hand, the Motion could be construed as a motion for judgment on the pleadings under Rule 12(c). *Desai v. Geico Cas. Co.*, 541 F. Supp. 3d 817, 821 (N.D. Ohio 2021) ("Rule 12(c) provides that, once 'the pleadings are closed' a party may 'move for judgment on the pleadings.'"). Doing so would render the motion timely, but Rule 12(c) also does not permit the Court to consider matters outside of the pleadings. *See Whittiker v. Deutsche Bank Nat. Tr. Co.*, 605 F. Supp. 2d 914, 924 (N.D. Ohio 2009) ("motion to dismiss or motion for judgment on the pleadings, the Court may only consider documents attached to, incorporated by, or referred to in the pleadings.").

Finally, if the Court considers matters outside the pleadings, it must treat the Motion "as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). And "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). And in this Circuit, "[i]t is well-established that the plaintiff must receive 'a full opportunity to conduct discovery' to be able to successfully defeat a motion for summary judgment." *Candelario v. Lorain Cnty. Vending, Inc.*, No. 1:17 CV 1488, 2017 WL 11495507, at *1 (N.D. Ohio Nov. 29, 2017) (*Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004)).

To the extent the Court converts this motion to a motion for summary judgment, Plaintiffs request an opportunity to conduct discovery and an opportunity to present evidence to counter Epiq's selective rendition of the facts.

Regardless of the standard applied, Epiq's motion fails. Indeed, it misunderstands the pleading requirements for ATDS and prerecorded call claims; it misunderstands what's required to establish an injury in fact for standing purposes; and Epiq gets it wrong with respect to direct and vicarious liability under the TCPA. For these reasons and as set forth below, the Motion should be denied in its entirety.

    **A.**    **Plaintiffs' Pleaded Sufficient Details to Infer that the Calls Were Made Using an ATDS.**

Epiq starts by claiming that Plaintiffs' ATDS allegations should be dismissed because: (1) it did not make the initial call, (2) the text message was "directed" to "Kaylie", and (3) "Mrs. Pavelka provided consent to receive" the text message calls based on the Datalot Recording. (Mot. at 7-8.) Whether Epiq or its agent placed the call, it can still be held liable for the violations as explained in Section D, *infra*, and Plaintiffs have plead sufficient facts to plausibly allege that an autodialer was used.

The central case is *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), where the Supreme Court held that, to qualify as an ATDS, the dialer at issue "must have the **capacity** either to *store* a telephone number using a random or sequential generator or to *produce* a telephone number using a random or sequential number generator." *Duguid*, 141 S. Ct. at 1167 (emphasis added). Given that the dialing system is solely in possession of the party making the calls, "this Court recognizes the difficulty a plaintiff faces in knowing the type of calling system used without the benefit of discovery". *Christopher Seri v. Crosscountry Mortg., Inc.*, No. 1:16-CV-01214-DAP,

2016 WL 5405257, at *2 (N.D. Ohio Sept. 28, 2016). As a result, courts, including post-*Facebook* courts, typically permit plaintiffs to rely on indirect allegations to raise the inference that an ATDS was used, such as the content and context of the calls or messages, dead air upon answering a call, a "click and pause" upon answering a call, and a noticeable delay. *See id.* (finding a "noticeable delay" sufficient to state an ATDS claim); *Mey v. All Access Telecom, Inc.*, No. 5:19-CV-00237, 2021 WL 8892198, at *2–3 (N.D.W. Va. Sept. 7, 2021) (finding allegations that calls were "impersonal" and that the calls featured "dead air" upon being answered sufficient); *Gonzalez v. HOSOPO Corp.*, 371 F. Supp. 3d 26, 28 (D. Mass. 2019) (finding that "a 'click and pause' sound upon answering each of those calls" was sufficient to state an ATDS claim); *Swartz v. JPMorgan Chase Bank, N.A.*, No. 3:21-CV-01064, 2022 WL 987883, at *4 (M.D. Pa. Mar. 31, 2022); *Garner v. Allstate Ins. Co.*, No. 20 C 4693, 2021 WL 3857786, at *3 (N.D. Ill. Aug. 30, 2021). There is no "specific checklist" for alleging the use of an ATDS; rather, it is a fact-specific inquiry with no one fact controlling. *Scanlon v. Manscaped, LLC*, No. CV 20-10795-IT, 2020 WL 13454130, at *3 (D. Mass. Dec. 14, 2020).

Here, as in most other TCPA cases, Plaintiffs are not privy to the exact specifications of the dialer(s) that Defendant (or its agent) used to place the voice and text message calls at issue. Absent discovery, they can only be expected to support their ATDS claims with indirect allegations related to the nature and content of the calls. And though Defendant would have the Court believe that Plaintiffs have not alleged facts to demonstrate "that Paul Moss used an ATDS to contact them", the Complaint actually includes specific details about the use of an ATDS, including: (1) that Kaylee Pavelka heard repeated "bloop" and "swoosh" sounds prior to being connected with Epiq's representatives (Compl. ¶ 20); (2) that the text messages were

impersonal in nature, including a generic marketing message suitable for any consumer (*id.* ¶ 24); (3) that the message contained automated response options ("Reply STOP to unsubscribe") (*id.*); and (4) that it had an automated opt out message (*id.*). Paired with the allegations regarding the function of Epiq's dialer (*id.* ¶¶ 8-10), these allegations are sufficient to support a reasonable inference of the use of an ATDS above the speculative level. *Scanlon* 2020 WL 13454130 at *3; *see also Jara v. Redbox Automated Retail, LLC*, No. 19 C 4532, 2020 WL 433869, at *2 (N.D. Ill. Jan. 28, 2020) (finding that text messages containing a generic message and automated response option, were sufficient to allege use of an ATDS); *Mina v. Red Robin Int'l, Inc.*, No. CV 18-9472 PSG (GJSx), 2019 WL 8108718, at *4 (C.D. Cal. Oct. 15, 2019) (same).

Defendant ignores these factual allegations and instead focuses almost exclusively on factual allegations outside of the pleadings by claiming that it did not initiate the call at issue, that the text messages were "targeted" and therefore not randomly generated, and that Plaintiffs consented during the warm transfer. (Mot. at 7-8.) While the extraneous allegations are improper at this stage, the arguments fail regardless. First, because Epiq concedes that it did place at least one of the text messages at issue, dismissal of the ATDS claim is improper. Additionally, as explained in Sections D, *infra*, Epiq can be held liable for the offending calls at issue whether it employed an ATDS or whether it hired an agent to do so on its behalf.

Whether the texts were targeted to Plaintiffs likewise isn't relevant. Indeed, the ATDS inquiry focuses on the "capacity" to utilize a random or sequential number generator, not whether that feature is employed with respect to each and every call. And in any case, Epiq's argument also ignores the complaint's allegations that the dialer "has the *capacity* to use a *random or sequential number generator* in the process of **storing** numbers from a pre-produced

list for texting and calling at a later date." (Compl. ¶ 9) (emphasis added). The capacity to store numbers using a random or sequential number generator for future calling campaigns is precisely one of the categories that *Duguid* identified as within the ATDS definition. *Duguid*, 141 S. Ct. at 1172 n.7 ("For instance, an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list. It would then store those numbers to be dialed at a later time."). To adopted Epiq's argument that telephone numbers must be random generated to qualify as an ATDS would read "store" completely out of the definition.

And while Epiq's additional allegations are improper at this stage, they also reinforce the belief that an ATDS was utilized. Indeed, as evidenced by the selective screenshots produced by Epiq, the system apparently automatically adds and removes numbers from its systems to be texted in its "Drip Campaign[s]" (dkt. 20-3, Ex. A)—which suggests that it utilizes a highly automated system that automatically sends text messages to consumers absent any human intervention.[1] Put simply, the facts produced to date demonstrate that Epiq likely employed a dialing system that had the capability to function as an autodialer, and its motion should be denied.

Finally, Epiq's claim that Plaintiffs consented to the subsequent calls during the initial unlawful call goes nowhere. The problem with this argument is two-fold. First, consent "is not

---

[1] *See* https://www.podium.com/article/drip-campaign-ideas/ ("**A text drip campaign** is an SMS marketing strategy that centers around a time-released set of **automated text messages**.") (last visited April 12, 2023) (emphasis added) ;.https://www.trumpia.com/product/automation/drip-campaigns ("What is a SMS texting drip campaign? It is a type of campaign that methodically and regularly sends messages at a specific interval whenever someone takes a certain action in our system.") (last visited April 12, 2023); https://www.eztexting.com/resources/sms-resources/what-drip-campaign ("A Drip Campaign, whether sent via email or text marketing, is a time-released set of automated communications.") (last visited April 12, 2023)

9

an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof." *Rodriguez v. Premier Bankcard, LLC*, No. 3:16CV2541, 2018 WL 4184742, at *3 (N.D. Ohio Aug. 31, 2018) (quoting *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017)). And second, to place telemarketing calls, Epiq must have "prior express **written** consent." *Shelton v. Direct Energy, L.P.*, No. 1:19CV0081, 2019 WL 4194179, at *5 (N.D. Ohio Aug. 27, 2019) (emphasis added). Hence, oral consent (which is only sufficient for *informational* calls under the TCPA) is of no help to Epiq's case. If anything, Epiq's failure to produce written consent is tantamount to conceding that it lacks any sufficient evidence of consent at all.

Ultimately, Plaintiffs allege sufficient facts that, if proven true, would show that the calls and text messages they received were made using an ATDS. At the pleading stage, the Court must draw all reasonable inferences in favor of the non-moving party, and Plaintiffs provide an adequate factual basis to draw the reasonable inference that Epiq made calls using an ATDS. Defendant's motion should therefore be denied.

**B.  Plaintiffs Adequately Plead The Use Of A Prerecorded Voice.**

Next, Epiq asserts that "Plaintiffs fail to allege any facts supporting their allegations that Defendant made calls with a prerecorded voice." (Mot. at 8.) Epiq's argument ignores the plain allegations of the complaint.

The TCPA prohibits calls that feature an artificial or prerecorded voice to consumer cellphones. 47 U.S.C. § 227(b)(1)(A)(iii). With regard to what is required to state a claim at the motion to dismiss stage, the case law is mixed. Some courts find allegations that a call featured a prerecorded voice on their own to be sufficient. *See Baker v. Caribbean Cruise Line, Inc.*, No.

10

CV 13-8246-PCT-PGR, 2014 WL 880634, at *3–4 (D. Ariz. Mar. 6, 2014) (finding allegations that the plaintiff "heard a prerecorded messages" sufficient to state a claim) (collecting cases); *Vaccaro v. CVS Pharmacy, Inc.*, No. 13-CV-174-IEG RBB, 2013 WL 3776927, at *2 (S.D. Cal. July 16, 2013); *Mata v. Veros Credit, LLC*, No. SACV1698DOCJCGX, 2017 WL 2644633, at *4 (C.D. Cal. Jan. 20, 2017) (citation omitted).

Other courts require some additional facts from which the use of a prerecorded voice can be inferred, such the content of the message or the cadence of the speaker. *See Chapman v. Nat'l Health Plans & Benefits Agency, LLC*, No. 22-10229, 2022 WL 3130225, at *6 (E.D. Mich. Aug. 4, 2022) (finding that detailing the contents of a prerecorded voice is sufficient to state a claim); *Reo v. Caribbean Cruise Line, Inc.*, No. 1:14 CV 1374, 2016 WL 1109042, at *4 (N.D. Ohio Mar. 18, 2016) (granting a motion to dismiss where the plaintiff provided "no description of the content of the calls" or why they believed the calls were prerecorded); *Greene v. Select Funding, LLC*, No. 2:20-CV-07333-RGK-KS, 2021 WL 4926495, at *4 (C.D. Cal. Feb. 5, 2021) (allegations regarding "the generic content of the voice message" and "the speaker's cadence" is sufficient to infer the use of a prerecorded voice.). Regardless of the standard applied, "courts have made clear that properly pleading a prerecorded message is a low bar." *Chapman*, 2022 WL 3130225, at *6.

Even applying the stricter standard, Plaintiffs' allegations easily support an inference that a prerecorded voice was utilized. Indeed, Plaintiffs allege the content of the messages, specifically that she heard a recording stating that she would be connected to an agent for coverage options. (Compl. ¶ 20.) Plaintiffs also allege that Kaylee spoke to live representatives as well (*id.*), which further demonstrates that she understood the difference between a live voice

11

and a prerecorded voice. Together, the allegations support the conclusion that a prerecorded voice was utilized.[2] Indeed, whether an individual is speaking with a recorded voice as opposed to a live caller is easily discernably by a lay person.

Put simply, Plaintiffs has alleged sufficient facts from which the Court could plausibly infer that the call featured a prerecorded voice, and the Motion should be denied.

### C. By alleging that they suffered aggravation, nuisance, and invasion of privacy as a result of the unlawful calls, Plaintiffs have alleged an injury in fact sufficient to confer standing.

Epiq next claims that Plaintiffs lack standing because they apparently have not "suffered a concrete injury in-fact" that "was likely caused by Paul Moss". (Mot. at 9.) Epiq fails to understand standing in the context of the TCPA.

To satisfy Article III standing, Plaintiff must "show: 1) an injury in fact; 2) a sufficient causal connection between the injury and the conduct complained of; and 3) a likelihood that the injury will be redressed by a favorable decision." *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1207 (M.D. Tenn. 2017) (citing *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130). To establish an injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (citing *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130)). While Congress may not convert generalized grievances into rights, it "may, however, 'enact statutes

---

[2] While incomplete and improper at this stage, the recordings filed by Epiq further support Plaintiffs' allegations. (Dkt. 20-3, Ex. B.) Indeed, at 9 minutes and 39 seconds into Epiq's own recording, a prerecorded voice can be heard as described in the complaint. (*Id.*)

creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute.'" *Imhoff Inv., L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627, 633 (6th Cir. 2015) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)).

"When Congress enacted the TCPA, it did so in part to protect consumers from the 'nuisance, invasion of privacy, cost, and inconvenience that autodialed and prerecorded calls generate.'" *Meredith v. United Collection Bureau, Inc.*, No. 1:16 CV 1102, 2018 WL 1782854, at *3 (N.D. Ohio Apr. 13, 2018) (citation omitted); *Silbaugh v. CenStar Energy Corp.*, No. 1:18 CV 161, 2018 WL 4558409, at *2 (N.D. Ohio Sept. 21, 2018) (collecting cases) (In enacting the TCPA, "Congress recognized that the interruption, intrusion, and invasion of privacy caused by unwanted communications can rise to the level of a nuisance which is actionable under the law.").

Most courts post-*Spokeo* have held that a violation of the TCPA necessarily causes harm to consumers, including "(1) invasion of privacy, (2) intrusion upon and occupation of the capacity of the consumer's cell phone, and (3) wasting the consumer's time." *Silbaugh*, 2018 WL 4558409, at *2 (collecting cases); *see also Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) ("[a] plaintiff alleging a violation under the TCPA 'need not allege any additional harm beyond the one Congress has identified.'"). Other courts require additional allegations such as "monetary losses, opportunity losses (potential for missed calls), stress or wear and tear on the system through unwanted use, and the nuisance of interruptions." *Silbaugh*, 2018 WL 4558409, at *2.

Plaintiffs have sufficient alleged an injury in fact. Indeed, Plaintiffs allege the receipt of one call and two text messages from Defendant in violation of the TCPA. (Compl. ¶¶ 20-24.)

Plaintiff also alleged the harms associated with their receipt of unsolicited calls, including aggravation, nuisance, and invasion of privacy that resulted in the loss of value for monies paid to their telephone carrier. (*Id.* ¶ 13.) Plaintiffs also allege that the calls interfered with and interrupted their use and enjoyment of their phones and caused wear and tear on their phones. (*Id.*) Nothing more is needed to satisfy the standing inquiry.

Furthermore, while Epiq takes issue with both Jackson Pavelka, the subscriber for the phone number at issue, and Kaylee Pavelka, the customary user of the phone number at issue, being named as Plaintiffs (mot. at 9), there is nothing improper by including both the subscriber and customary user in this case. As this Court has previously explained, a "called party" is "*either* the subscriber to a particular phone number, or, '*the non-subscriber customary user of a telephone number included in a family or business calling plan*.'" *Rodriguez v. Premier Bankcard, LLC*, No. 3:16CV2541, 2018 WL 4184742, at *7 (N.D. Ohio Aug. 31, 2018) (emphasis in original); *see also Maraan v. Dish Network, L.L.C.*, No. 1:13-CV-00436, 2014 WL 6603233, at *5 (S.D. Ohio Nov. 19, 2014). And in any case, Plaintiffs are not seeking to double their recovery as Epiq claims. Rather, Plaintiffs seek damages for each violation (i.e. each unlawful call) of the TCPA. (*See* Prayer For Relief ¶ D.)

In short, Plaintiffs have alleged sufficient facts to establish an injury in fact for standing purposes that is traceable to Epiq's actions, and the Motion should be denied.

> **D.    Because Plaintiffs allege that Epiq directly placed the offending calls and texts, it can be held directly liable.**

Epiq closes its motion by claiming that "Plaintiffs have not sufficiently plead vicarious liability." (Mot. at 11.) This argument ignores the plain allegations of the Complaint, which allege that Epiq directly placed the calls and texts at issue. As an alternative theory, Plaintiff also

14

alleges that Epiq can be held vicarious liability for the calls at issue.

"A seller can be held either directly or vicariously liable for violations of this provision of the TCPA." *Jayson Rogers, Plaintiff, v. Interstate Nat'l Dealer Servs. Inc., et al., Defendants.*, No. 1:20 CV 00554, 2020 WL 4582689, at *3 (N.D. Ohio Aug. 10, 2020) (citing *Keating v. Peterson's Nelnet, LLC*, 615 Fed.Appx. 365, 371 (6th Cir. 2015) (citing *In re Joint Petition Filed by DISH Network, LLC*, 28 FCC Rcd. 6574 (2013))). A seller who initiates a call or text message can be held directly liable under the TCPA. *Id.* (citing *In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6583 (2013)); *Murray v. Choice Energy, LLC*, No. 1:15-CV-60, 2015 WL 4204398, at *3 (S.D. Ohio July 10, 2015).

In this case, Plaintiffs allege that Epiq directly placed the calls and texts at issue to solicit sales for its auto insurance policies. (Compl. ¶¶ 6-7.) Rather than acknowledge the allegations, Epiq focuses instead on Plaintiffs' alternative vicarious liability theory. (Mot. at 10-12.) But Rule 8 expressly permits alternative pleadings, and "the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2). For this reason, alternative theories are "not a basis for dismissal". *DeNune v. Consol. Cap. of N. Am., Inc.*, 288 F. Supp. 2d 844, 855 (N.D. Ohio 2003). Because Plaintiffs allege that Epiq directly placed the offending calls and texts, the Motion should be denied. *See Whittaker v. Freeway Ins. Servs. Am., LLC*, No. CV-22-8042-PCT-DGC, 2023 WL 167040, at *5 (D. Ariz. Jan. 12, 2023) (denying a similar argument involving direct and vicarious liability in a TCPA case).

In addition to its failure to acknowledge its direct liability, Epiq is simply incorrect on the law when it claims that it cannot be held vicariously liable because it did not place some (but not all) of the calls at issue. Rather, "[a] seller can be vicariously liable for TCPA violations

15

committed by a third party telemarketer under federal common law agency principles." *Jayson Rogers, Plaintiff*, 2020 WL 4582689, at *4. Thus, an agency relationship can be established by "actual authority, apparent authority, and ratification." *Id.* (citing *Keating*, 615 Fed.Appx. at 371). "[A]n agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 373 (6th Cir. 2015) (citing *Restatement (Third) of Agency*, at § 2.01). Apparent authority arises where a principal holds "the agent out to third parties as possessing sufficient authority to commit the particular act in question, and there was reliance upon the apparent authority." *Id.* Lastly, ratification "is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Jayson Rogers, Plaintiff*, 2020 WL 4582689, at *4.

While improper at this stage, Epiq's selective and incomplete rendition of the facts do not support its claim that it cannot be held liable for the call at issue. While it claims that it has no control, the Datalot contract says otherwise. Indeed, the contract requires Datalot to work to gather and "transfer" leads that meet Epiq's criteria. (Dkt. 20-2, Ex. A, at pg. 1.) The contract further requires Datalot to procure "Valid Leads" for Epiq, which requires Datalot to obtain consumers' "first and last name, address, email, phone number, and date of birth". (*Id.*) In other words, Epiq has control over the content of the calls placed by Datalot and reserves the right to reject any leads that don't meet its strict standards. Further, and suspiciously absent from Epiq's motion is its TCPA Addendum to the Datalot contract. (*See* TCPA Addendum, attached hereto as Ex. A). The Addendum reveals even more control that Epiq has over Datalot, including requiring

16

the retention of records relating to consumers' consent on behalf of Epiq for a period of 5 years (*id.* at pg. 2); requiring the implementation policies and procedures to ensure compliance with the TCPA and requiring that those policies and procedures be provided to Epiq, upon request (*id.* at pg. 3); requiring Datalot to notify Epiq of any subpoenas that it receives for leads sold to Epiq (*id.*); and giving Epiq the power to require Datalot to take steps to end procedures that it believes violate the TCPA, including requiring Datalot to notify Epiq regarding the actions of its subcontractors (*id.*).  Together, the allegations demonstrate that Epiq and Datalot established a principal/agent relationship, and Epiq can be held liable for any misconduct on the part of Datalot.

Ultimately, the determination of whether an agency relationship exists turns on the conduct of the parties and not how the parties define the relationship. *See ABS Indus., Inc. ex rel. ABS Litig. Tr. v. Fifth Third Bank*, 333 F. App'x 994, 1000 (6th Cir. 2009) ("The Restatement also recognizes that "[w]hether a relationship is characterized as agency in an agreement between parties or in the context of industry or popular usage is not controlling." (citing *Restatement (Third) of Agency*, at § 1.02)). At the present stage, there simply is not a complete record for the Court to determine that Datalot did not act as the agent for Epiq.

Because Epiq can be held directly and vicariously liable for the calls at issue, the Motion should be denied.

### E. To The Extent The Court Finds That The Complaint Is Deficient, Plaintiffs Should Be Granted Leave To Amend.

"Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely given when justice so requires." *CompuServe Inc. v. Saperstein*, 172 F.3d 47 (6th Cir. 1999). "[D]ismissal with prejudice and without leave to amend is not appropriate unless it is

clear on de novo review that the complaint could not be saved by amendment." *Newberry v. Silverman*, 789 F.3d 636, 646 (6th Cir. 2015) (citation omitted). To the extent the Court determines that Plaintiffs' complaint should be dismissed, Plaintiffs respectfully request leave to amend to cure any defects.

## IV. CONCLUSION

Defendant's motion should be denied in its entirety. Plaintiffs allege facts that if proven true, would show that the calls and texts they received were made using an ATDS and a prerecorded voice. Further, because Plaintiffs alleged that they suffered injuries as a result of the offending calls and texts, they have standing to seek redress for their harms. Finally, Epiq can be held both directly and vicariously liable for the calls and texts at issue. Accordingly, Plaintiffs respectfully request that the Court deny Defendant's motion in its entirety and grant any additional relief as the Court deems necessary, reasonable, and just.

Respectfully Submitted,

**JACKSON PAVELKA and KAYLEE PAVELKA**, individually and on behalf of all others similarly situated,

Dated: April 18, 2023　　　　　　　　By: /s/ Taylor T. Smith

Scott D. Simpkins
SDSIMP@climacolaw.com
Climaco, Wilcox, Peca & Garofoli Co., LPA
55 Public Square, Suite 1950
Cleveland, Ohio 44113
Telephone: (216) 621-8484

Taylor T. Smith*

18

       tsmith@woodrowpeluso.com
       Woodrow & Peluso, LLC
       3900 East Mexico Ave., Suite 300
       Denver, Colorado 80210
       Telephone: (720) 907-7628
       Facsimile: (303) 927-0809

       Attorneys for Plaintiffs and the Classes

\* *Pro Hac Vice*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above titled document was served upon counsel of record by filing such papers via Court's ECF system on April 18, 2023.

    /s/ Taylor T. Smith
Taylor T. Smith